```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- x
UNITED STATES OF AMERICA,               :
                                        :
                -v-                     :   10 Cr. 50 (JSR)
                                        :
SAYED NOORALISHAH SHENGHUR,             :   OPINION
                                        :
                Defendant.              :
--------------------------------------- x
```

JED S. RAKOFF, U.S.D.J.

    Beginning April 30, 2010, the Court conducted a five-day evidentiary hearing to determine whether, as the Government alleged, defendant Sayed Nooralishah Shenghur was competent to stand trial or whether, as defense counsel asserted, defendant was incompetent to stand trial or should be the subject of further physical or psychological evaluation. The proof included, inter alia, the testimony of the Government's expert, Dr. Cheryl Paradis, who opined that defendant was competent, the defendant's expert, Dr. Marc Janoson, who opined that the defendant was not competent, several recently taped conversations of Mr. Shenghur, and the results of various psychological tests. In addition, although defendant did not testify, the Court had ample opportunity to observe his demeanor and hear his volunteered statements. Finally, following the hearing, the Court received, in addition to legal memoranda, certain records of the former Immigration and Naturalization Service ("INS") relating to the defendant's mental health.

    After full consideration of the evidence provided at the hearing and the parties' written submissions, the Court, by "bottom line" Order dated June 15, 2010, concluded that Mr. Shenghur was able

Case 1:10-cr-00050-JSR   Document 27   Filed 09/02/10   Page 2 of 11

to "understand the nature and consequences of the proceedings against him," as well as "to assist properly in his defense," and therefore was competent to stand trial. 18 U.S.C. § 4241(a),(d). This Court indicated it would eventually file a written Opinion detailing the reasons for those conclusions. This is that Opinion.[1]

As a threshold matter, the Court addresses which party carries the ultimate burden of establishing defendant's competency.[2] In United States v. Nichols, 56 F.3d 403 (2d Cir. 1995), the Second Circuit chose not to decide the issue, noting that it would rarely make a difference. Id. at 410 ("The allocation of the burden of proof to the defendant will affect competency determinations only in a narrow class of cases where the evidence is in equipoise; that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent."). Courts in this district have followed that approach by declining to reach the issue, see, e.g., United States v. Wolfson, 616 F. Supp. 2d 398, 415 (S.D.N.Y. 2008), and this Court follows suit. Specifically, this Court finds that, regardless of which side has the burden of proof, the evidence of the defendant's competency to stand trial in this case is overwhelming.

---

[1] In the interim, defendant proceeded to trial, at the end of which, on August 5, 2010, he was convicted of conspiracy to distribute heroin. Sentencing has been set for November 17, 2010.

[2] Both sides are agreed that the initial burden of coming forward with a colorable claim that defendant is incompetent rests with the defendant.

2

To begin with, the "battle of experts" clearly favored the Government. The Government's psychiatric expert, Dr. Paradis, interviewed Mr. Shenghur on two occasions, and in both, he came across as perfectly competent. He understood Dr. Paradis's questions and responded coherently and with intelligence. Transcript of Competency Hearing ("Tr.") at 17, 42-43, 100-01, 369-70. He understood the charges against him, the roles of the various players, and the different options open to him. Id. at 96, 99, 105-07, 374-76, 389.

When, however, Dr. Paradis turned to putting questions to defendant that related to his claim of incompetency, Mr. Shenghur suddenly began to provide incongruous responses. For example, she asked him to repeat three simple words: "door, cat, pencil" and he responded "bird, head, and hat." Tr. at 18, 41.[3] Based on such responses -- so inconsistent with his prior coherence -- Dr. Paradis suspected Mr. Shenghur of malingering, and proceeded to administer the Test of Memory Malingering (the "TOMM"), a 50-item recognition test in which, during the first phase, the patient is shown 50 line drawings of common objects at various intervals, and then, during the second and subsequent phases, is shown an image he has already seen alongside an image not among the original 50 and asked which one he has seen before. Id. at 18. Mr. Shenghur's performance -- scoring 16 out of 50 on the third trial of the test, and well below the

---

[3] Although English is not defendant's native language, and he was provided with an interpreter during all court proceedings, defendant speaks and understands English quite well, as evidenced by his taped conversations, which were conducted in English.

3

standard cut-off of 45 -- is indicative of someone who is malingering. See id. at 39.

While the TOMM, like other psychological tests, suffers from less than perfect scientific validation, the literature suggests that it is better than other tests for malingering. See Def. Ex. 12, Lilio O. Graue et al., Identification of Feigned Mental Retardation Using the New Generation of Malingering Detection Instruments: Preliminary Findings, 21 THE CLINICAL NEUROPSYCHOLOGIST 929, 932, 937-40 (2007); see also Def. Ex. 9, Gordon Teichner and Mark T. Wagner, The Test of Memory Malingering (TOMM): normative data from cognitively intact, cognitively impaired, and elderly patients with dementia, 19 ARCHIVES OF CLINICAL NEUROPSYCHOLOGY 455 (2004). The TOMM functions in a very common-sense way, as it simply requires the individual to assess whether an image is familiar, based on prior viewings. As Dr. Paradis testified, the overwhelming majority of truthful individuals, even those who are cognitively impaired or suffer mental retardation, perform reasonably well on the TOMM, because the test requires you to simply select the image that seems more familiar, having recently viewed that image at least once if not more times. Tr. at 37. Here, where Mr. Shenghur scored significantly lower than chance would predict and much lower than any of the aforementioned cut-off points, his results suggest that, more likely than not, Mr. Shenghur was malingering. Id. at 37-38. Indeed, in the view of the Court, based on all of the evidence before it, the evidence that Mr. Shenghur was pretending to be incompetent is compelling.

The defendant's expert, Dr. Janoson, was less persuasive. Dr. Janoson administered a number of tests -- the Wechsler Adult Intelligence Scale ("WAIS"), the Bender-Gestalt test (the "Bender"), the Fitness Assessment Interview ("FAI"), and the Human Figure Drawings test -- on the basis of which he drew extensive conclusions. For example, Dr. Janoson stated in his written report (which was received in evidence) that the defendant's results on the Bender, a screening test for brain dysfunction that requires the patient to reproduce a series of geometric figures, were "unequivocally indicative of cerebral dysfunction on an organic basis," Def. Ex. 1. Similarly, with respect to the human figure drawings test, Dr. Janoson asserted that the defendant's drawings, in which body parts were misplaced and facial features were omitted, clearly indicated brain damage. Tr. at 244-45, 250-52. Finally, based on the Fitness Assessment Interview, a series of questions designed to test the individual's knowledge of the court system, Dr. Janoson concluded that the defendant lacked a sufficient understanding of the U.S. legal system to assist in his own defense. Id. at 336-37.

Despite these conclusions, Dr. Janoson conceded that the defendant's extremely low scores could be the product of malingering. Id. at 70, 73, 136-37, 254. But he discounted this possibility because, in his view, the defendant would have had to have studied the tests in advance -- in particular, the human figure drawings test -- and learned what signs would be interpreted by an analyst as indicating brain damage or dementia, in order to malinger. See Tr.

at 206, 353-54. But the Court is unpersuaded by this assertion for several reasons:

First, the tests, most especially the human figure drawings test, are of doubtful validity and reliability. <u>See</u> Gov't Ex. 20, Stephen J. Lally, <u>Should Human Figure Drawings Be Admitted Into Court?</u>, 76 JOURNAL OF PERSONALITY ASSESSMENT 135, 140 (2001); Gov. Ex. 28, at 51-52; Gov't Ex. 20, at 146 (discussing scoring criteria for human figure drawings and stating that they "arguably have a place in clinical practice, but they clearly do not belong in the courtroom").

Second, analysis of the drawings and of other tests Dr. Janoson administered is a highly subjective enterprise. <u>See, e.g.</u>, Gov't Ex. 20 at 140; Gov't Ex. 31, Michael N. Lopez et al., <u>Psychometric Properties of the Bender Gestalt Test Using Lacks' Version of the Hutt-Briskin Scoring System</u>, 14 APPLIED NEUROPSYCHOLOGY 284, at *2 (2007) ("There is a great deal of subjectivity involved when scoring the BGT using Lacks' (1999) system."). Moreover, Dr. Janoson used hybrid approaches to scoring, thus increasing the subjective dimension of the testing. <u>See, e.g.</u>, Tr. at 199-201, 204, 243, 261.

Third, the bases of Dr. Janoson's conclusions were obscured by his methodology. For example, during the hearing, Dr. Janoson attempted to "rescore" Mr. Shenghur's results on the Bender-Gestalt test using Patricia Lacks's scoring system. Tr. at 232, 235-36. However, neither the Government nor Dr. Paradis could review his reassessment because he permitted Mr. Shenghur to draw each of his drawings one on top of the other, <u>id.</u> at 265, 340, thus leaving no

6

independent data for review. Even if this were the standard protocol for administering the test, as Dr. Janoson insisted, id. at 341, Dr. Janoson's conclusions about Mr. Shenghur's competency based on that test were much less convincing as a result.

Fourth, there is no doubt in the Court's mind that Dr. Janoson was predisposed to find Shenghur incompetent, and this bias infected his interpretation of the test results and colored his overall conclusions. Thus, even though the inherent uncertainty of psychological testing and evaluation would normally bespeak caution, Dr. Janoson often described his conclusions as "unequivocal." See id. at 352; see also Def. Exh. 1 ("An objective competency instrument, the FAI, indicates unequivocally that [Shenghur] is unfit to proceed."). Moreover, Dr. Janoson's consistent use of descriptors such as "crazy" or "nutty," see, e.g., Tr. at 57, 59, 61, 267, suggested a less than objective assessment of the issues he was asked to address. Further still, Dr. Janoson conceded that if tape recordings were presented of phone conversations in which Mr. Shenghur spoke of his defense in a manner that was rational, demonstrated an understanding of the seriousness of the situation in which the defendant found himself, or provided evidence of his ability to conduct business transactions, this would potentially alter Dr. Janoson's opinion as to his competency, see id. at 291; but when Dr. Janoson was presented with just such tapes (discussed below), he described the exchange as "crazy talk" and did not alter his conclusions one whit. Tr. at 267, 325-27, 346.

Finally, perhaps the best evidence that Dr. Janoson did not proceed with sufficient carefulness, objectivity, or reliability was his reference to Williams Syndrome. See id. at 109. In preparing his report, he noticed a handwritten notation in Mr. Shenghur's medical records which indicated a possible diagnosis of either "kyphosis" or "icyphosis" (depending on interpretation of the handwriting), neither of which Janoson recognized. He proceeded to conduct an internet search, and found a single reference to "icyphosis," in an article that also mentions Williams Syndrome (a mental disorder) but does not link them causally. On that limited basis, he concluded in his report that "[t]he medical records indicate that [Shenghur] has been diagnosed with Williams' Syndrome." Def. Ex. 1 at 2. See id. at 109-110, 114. Yet, as defense counsel later conceded, the reference to "icyphosis" in the internet article was simply a scanning error, and the article, as well as other publications, made plain that kyphosis, which is what the article actually referred to, simply means curvature of the spine and has nothing to do with Williams Syndrome or any other mental disorder. See, e.g., Tr. 176-77. Although at the hearing Dr. Janoson attempted to distance himself from his earlier conclusion, see id. at 120-22, 128, his willingness in his report to transform a passing reference to a term he knew nothing about into an assertion that Shenghur had been diagnosed with a serious mental illness speaks volumes about the credibility of his conclusions generally.[4]

---

[4] Anyone who takes issue with Dr. Janoson appears destined to feel his wrath. Confronted here by the Government with a

In short, the Court found Dr. Paradis's methodology and conclusions wholly reliable and Dr. Janoson's methodology and conclusions unpersuasive. Independently, moreover, there was other, irrefutable evidence that not only fully corroborated Dr. Paradis's conclusions but also, by itself, was more than sufficient to convince the Court of Shenghur's competency. Specifically, while the defendant was in jail awaiting trial, he made several telephone calls -- recorded by prison authorities and introduced by the Government at the hearing -- that established his competency beyond cavil. For example, in a conversation between Mr. Shenghur and his son on February 23, 2010, the defendant engaged in a clear and sophisticated discussion of his case, including the possibility of a "deal" with the Government and an evaluation of defenses he might interpose. See Gov't Ex. 5. Similarly, in another lucid conversation with his son, on April 1, 2010, Mr. Shenghur discussed, among other things, auto repairs and insurance, with no indication of experiencing any difficulty with communication or any cognitive impairment. See Gov't Ex. 18. Notwithstanding Dr. Janoson's testimony that some of the talk on the tapes was "crazy," the Court finds that no objective listener could listen to these tapes and not conclude that defendant was sane, rational, intelligent, fully understanding of his rights, fully able to assist in his defense, and, in a word, competent.

---

complaint against him by Justice Albert Tomei of the New York State Supreme Court, Dr. Janoson denounced Justice Tomei's thinking as "demented" and "paranoid," and offered the diagnosis that the Justice himself was demented and paranoid. Tr. at 124-26.

9

And there is more. The prior medical records (including the INS records belatedly added by the defense), while suggesting that Shenghur may have previously suffered from depression or the like, nowhere suggest that he would be incapable of understanding the charges against him or assisting in his defense. Moreover, the Court had a full opportunity to observe Mr. Shenghur during the five-day competency hearing and saw repeated evidence of malingering. Specifically, Mr. Shenghur adopted a new demeanor and used different body language each day to suggest he suffered from psychological distress. One day the defendant claimed he heard voices in his head, an assertion that the Court did not credit, as Mr. Shenghur paused at the appropriate moments to listen to the interpreter provide translations of the Court's questions, and then responded with claims that he could not hear. See id. at 175. Those voices did not return on any subsequent day of the hearing. On another occasion Mr. Shenghur sat with his head in his hands, and on still another day he sat upright and rigid, occasionally looking above him. Yet none of this behavior prevented him from having seemingly normal conversations with his defense counsel, as was made manifest, for example, during the Government's cross-examination of Dr. Janoson, when Mr. Shenghur interjected to ask if his attorney could show the Court some materials that the defendant had previously shown to his counsel. Id. at 207.

In his arguments at the hearing and written submissions before and thereafter, defense counsel raised several additional arguments, which the Court considered but found wholly lacking in

merit (and not worthy of further discussion here). Nor did the Court agree with defense counsel that there was a need to have the defendant subjected to additional physical or psychological testing, given the overwhelming evidence of competency.

Accordingly, for each and all of the foregoing reasons, the Court, by Order dated June 15, 2010, concluded that the defendant was fully competent to stand trial.

JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       September 1, 2010